STATE OF IOWA, appellee, v. ROBERT GREER, appellant.

No. 52084.

July 14, 1966.

W. Lawrence Oliver, of Des Moines, for appellant.

Lawrence F. Scalise, Attorney General, Don R. Bennett and Wade Clarke, Jr., Assistant Attorneys General, and Ray Fenton, of Des Moines, County Attorney, for appellee.

MASON, J.—April 16, 1964, the Polk County grand jury returned an indictment charging defendant with child desertion as defined in section 731.1, Code, 1962. Defendant entered a plea of

not guilty. Trial to jury resulted in a verdict of guilty. Motions for new trial and judgment notwithstanding the verdict (perhaps intended as a motion in arrest of judgment, section 788.1) being overruled, defendant was sentenced to imprisonment in the state penitentiary for not to exceed one year. From the judgment rendered, defendant appeals.

I. Defendant assigns as errors relied on for reversal: (1) overruling his motion for directed verdict at the close of the State's evidence and renewed at the close of all evidence, both motions being based on claimed insufficiency of the State's evidence to sustain the essential elements of the crime charged, and (2) refusal to admit into evidence exhibit C, a letter from the welfare department of Polk County to Mary Miller, mother of the children involved.

II. In August 1963 defendant was adjudicated the father of Monetta Lee Greer and John Carl Greer, born to Mary Miller on August 23, 1958, and August 25, 1962. The paternity adjudication was coupled with an order requiring defendant to pay $10 a week toward the maintenance and support of said children commencing August 23, 1963.

Receipts from Mary Miller reflect payments made directly to her by defendant, from the date of the paternity adjudication to the date of indictment, totaled $40, $20 on August 23, 1963, $10 on August 30 and September 6. At Christmas 1963 defendant bought the children over $100 worth of clothing. He had not purchased any clothes for himself since the children's birth. Defendant had paid Mary Miller $70 from June 12, 1963 to July 26, 1963.

Between July 1, 1963, and December 31, 1963, defendant had earnings totaling $2031.78, $1030.29 of which was earned between September 31, 1963, and the end of the year.

Defendant at time of trial was 39, had gone to the eleventh grade in school, had been married around 1948 and divorced, no children were born as the issue of that marriage although defendant had three children by another woman in addition to the two involved in the present action. He was in good health, lived at his parents' home and contributed $7.50 per week for the groceries when he had the money.

III. Defendant's complaint as to the court's refusal to admit exhibit C is without merit. We set out the exhibit in full:

"October 11, 1965

Miss Mary Miller
1514 Walker Street
Des Moines, Iowa
Dear Miss Miller:

The Attorney wants to see you in his office at 9:00 Wednesday, October 13th regarding the Court action against Mr. Greer. If you wish to continue to receive ADC assistance it will be necessary for you to cooperate in this.

Very truly yours,
LELAND AHERN, DIRECTOR
(Mrs.) Helen Hart
Public Welfare Worker II"

Defendant contends the court's ruling on the admissibility of the exhibit was prejudicial and prevented a fair trial because the jury was thus prevented from knowing who was the real prosecutor of the case and the attitude of the children's mother.

The fact that a public agency is interested in the prosecution of a public offense was neither material to prove any proposition in issue nor relevant as logically tending to establish any such material proposition.

IV. On a claim of insufficient evidence to sustain a conviction, we view the evidence in the light most favorable to the State. It is the fact-finder's function, not ours, to decide disputed fact questions. The finding of guilt by the trier of fact is binding upon us unless we are satisfied it is without substantial support in the evidence or is clearly against the weight thereof. State v. Stodola, 257 Iowa 863, 865, 866, 134 N.W.2d 920, 921, and citations.

Section 675.29 provides:

"Desertion statute applicable. The provisions of chapter 731, relating to desertion and abandonment of children, shall have the same force and effect in cases of illegitimacy where paternity has been judicially established, or has been acknowledged by the father in writing or by the furnishing of support, as in cases of children born in wedlock."

Section 731.1 provides:

" 'Desertion' defined. Every person who shall, * * *, without good cause, abandon his or her legitimate or legally adopted child or children under the age of sixteen years, leaving such child or children in a destitute condition, or shall, without good cause, willfully neglect or refuse to provide for such child or children, they being in a destitute condition, shall be deemed guilty of desertion * * *."

■■ The essential elements of a charge of child desertion are: (a) that the neglect or refusal to provide for the dependent was "without good cause", (b) that the neglect is willful, and (c) such neglect results in the child or children being destitute. State v. Ungry, 239 Iowa 1035, 1037, 33 N.W.2d 381, 382. All three of these essential elements must be established beyond a reasonable doubt. State v. Heath, 224 Iowa 483, 485, 276 N.W. 35, 36. The State must show more than failure of defendant to provide for his children. State v. Nichols, 219 Iowa 309, 311, 257 N.W. 813, 815.

■ V. We consider the first essential element. The term "good cause" as used in the statute means a sufficient cause. It must be one that affords a legal excuse for not providing for one's child. Whether such "good cause" does or does not exist in any case must be determined by the particular facts disclosed in the evidence. State v. Weymiller, 197 Iowa 1273, 1277, 198 N.W. 780, 781. In its instruction 9 the trial court told the jury:

"The term 'good cause' as used in the statute and these instructions means inability on the part of the defendant to make such provision for his minor children because of lack of funds or property or lack of employment, poor health, sickness, unemployment not occasioned by his own act, inability to secure employment, or any other means preventing the defendant from making such provision, through no fault of his own."

"Good cause" as used here means a substantial or legal cause, as distinguished from an assumed or imaginary pretense. State v. Sayre, 206 Iowa 1334, 1338, 222 N.W. 20, 22, and citations.

■ As stated, defendant earned over $2000 between July 1 and December 31, 1963. He contributed a total of $40 in cash payments toward the support and maintenance of these children

plus over $100 for clothing for them at Christmas, after being adjudicated their father and before indictment. Defendant during this time was able to live at his parents' home, contributing $7.50 per week as his share of the groceries, paying no rent nor charge for washing done by his mother and there is no evidence of any other debts paid during this period. He was able-bodied and in good health. Exhibit 4 reflects that after indictment defendant paid a total of $70 to the mother of his other three children between May 6 and July 28, 1964, plus $20 between July 11 and November 15, 1965. This element of the case was properly submitted by the court under the instructions. It seems apparent that if the State's evidence is believed, the finding defendant acted without good cause has substantial support.

VI. In determining whether the second essential element is present we should consider Code section 731.6, which provides:

"Prima-facie evidence. Proof of the desertion of wife, child, or children in destitute or necessitous circumstances or of neglect to furnish such wife, child, or children necessary and proper food, clothing, or shelter, shall be prima-facie evidence that such desertion or neglect was willful."

"That legislation, however, does not cast the burden of proof upon the defendant, but at all times requires the State to sustain guilt beyond a reasonable doubt. However, in meeting this demand the State has a right to take advantage of the 'prima-facie evidence' furnished by Section 13235, supra [now 731.6]. To put the idea in another way, it was the duty of the jury to take into consideration the 'prima-facie evidence' above named, excuses and explanations, if any, offered by the defendant, and all other testimony admitted in evidence, as well as the lack thereof, in determining whether or not there was guilt beyond a reasonable doubt." State v. Brodie, 206 Iowa 1340, 1342, 1343, 222 N.W. 23, 24, and citations.

"An analogy for the theory of this discussion may be found in our previous cases relating to the doctrine regarding unexplained possession of property recently stolen in larceny, burglary, and breaking and entering cases. * * *.

"* * * Without the statutory 'prima-facie evidence,' in some cases there might be lacking support for an essential element of the crime—to-wit, the willfulness thereof. Hence the

Legislature provided the statutory 'prima-facie evidence.' Yet the defendant at no time was burdened with the duty of producing evidence, even to the extent of a preponderance. Had he so desired, he could have refrained from introducing any testimony. But, nevertheless, at all times the burden of proof would have remained with the State, notwithstanding the 'prima-facie evidence' under said statute." State v. Brodie, supra, 206 Iowa, at 1343, 1345, 222 N.W., at 24, 25.

Attention is directed to the caution contained in State v. Hobbs, 252 Iowa 439, 449, 107 N.W.2d 242, 247.

In State v. Stodola, supra, 257 Iowa, at 866, 134 N.W.2d, at 922, we said:

██ "The term 'willfully' as used in a criminal statute of the kind involved here is defined * * * as intentionally or deliberately done, with a bad or evil purpose, as in violation of law, or wantonly and in disregard of the rights of others, or knowingly and of stubborn purpose, or contrary to a known duty, or without authority, and careless whether he have the right or not." (Citing cases)

The issue of "willfullness" was properly submitted to the jury and in our opinion there is substantial evidence to support the jury's finding.

██ VII. The last essential element is that such neglect results in the child or children being destitute.

"Destitute condition" as used in section 731.1 does not mean "naked", "unhoused", or "actual starvation." State v. Sayre, 206 Iowa 1334, 1337, 222 N.W. 20, 22, and citations.

In State v. Ungry, 239 Iowa 1035, 1038, 33 N.W.2d 381, 382, we quote with approval the following statement from State v. Manley, 197 Iowa 46, 54, 196 N.W. 724, 727: " * * * it is not necessary that the children be left absolutely unhoused, unclothed and in a condition of actual starvation, but it will be sufficient if they are in a condition of great need, a state of extreme poverty, or are without money or property upon which to rely for support, and dependent upon charity." (Citing cases)

██ Earlier in State v. Sayre, supra, 206 Iowa, at 1338, 222 N.W., at 21, we had said: "Nor is the 'destitute condition' removed because private or public charity intervenes to save the child from nakedness, the ravages of the physical elements, or

starvation; and this is true even if the 'private charity' is administered by relatives or near friends."

However, the children are not in a "destitute condition", as contemplated by the statute, if the mother, in the discharge of her maternal duty, sufficiently supported them. State v. Sayre, supra, 206 Iowa, at 1340, 222 N.W., at 22.

No one testified the children lacked food, clothing or housing. Inquiry was not made. The mother had been employed from time to time at a salary of $200 per month; however, there were periods when she was not employed because of her inability to obtain a baby-sitter. She had been receiving ADC payments since 1962 for care of the children. Mrs. Hart, a Polk County social welfare worker in charge of Mary Miller's case record pertaining to ADC payments for her children, testified that among the payments made were these: July 1963, $109.50; August, $110.50; September, $110.50; October, $110.50; November, $66.50; December, $66.50; January 1964, $66.50; February, $66.50; March, $110; and April, $128. In response to defense cross-examination as to why some payments were $66.50 as opposed to $128 and $109.50, Mrs. Hart answered part of the time Mary Miller was working but "when she wasn't working" she got more money. From this the jury certainly could draw an inference that Mary Miller was not working during August, September and October 1963 and during this period her children were dependent for existence on public charity and accordingly were legally in a destitute condition. While it is true she was able to work during November and December 1963 and the first two months of 1964, payments of $66.50 were necessary to maintain the children. But for the ADC payments, these children would have been in a condition of great need and without money or property upon which to rely for support particularly during those periods when the mother was unemployed.

The denial of defendant's motions for a directed verdict and for a new trial was correct. The matter was properly submitted by the court and we are of the opinion there was substantial evidence to support the verdict.

The case is affirmed.—Affirmed.

All Justices concur.