# IN THE COURT OF APPEALS OF IOWA

No. 18-0597
Filed June 19, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JONATHAN JAMES ELPHIC,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Franklin County, Peter B. Newell,

District Associate Judge.


        The defendant appeals from his conviction of forgery, a class "D" felony.

**AFFIRMED.**


        Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, for appellant.

        Jonathan Elphic, Fort Dodge, pro se.

        Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant

Attorney General, for appellee.


        Heard by Potterfield, P.J., and Doyle and May, JJ.

**POTTERFIELD, Presiding Judge.**

Jonathan Elphic appeals from his conviction for forgery, a class "D" felony. Elphic maintains the district court violated his right to due process and abused its discretion when it allowed the State to reopen the record after the prosecutor indicated the State rested its case and Elphic moved for a judgment of acquittal based on insufficient evidence.[1]  Elphic asserts his conviction should be vacated for insufficient evidence.

**I. Background Facts and Proceedings.**

Elphic was charged by trial information with one count of forgery.  The trial information identified Ana Palma Sierra as the person whose checks Elphic allegedly presented to various stores to purchase items and obtain cash.

Elphic entered a plea of not guilty, and a jury trial was scheduled to take place in February 2018.

On January 29, the State filed an application for the appointment of a court interpreter, indicating an oral language interpreter was needed to interpret the testimony of its witness, Palma Sierra, at the upcoming trial on February 8. The next day, the court granted the application and appointed an interpreter for the proceedings.

---

[1] Elphic also filed a pro se supplemental brief in which he raised a number of issues. Elphic does not cite any authority in support of the issues he raised, and his brief fails to comply with a number of our rules of appellate procedure.  *See In re Estate of DeTar*, 572 N.W.2d 178, 181 (Iowa Ct. App. 19997) ("We are not bound to consider a party's position when the brief fails to comply with the Iowa Rules of Appellate Procedure."). Because we hold pro se litigants to the same standard as Iowa attorneys, we do not consider any of these issues.  *See id.* (providing we must judge briefs by pro se litigants at the same standard we judge those by Iowa attorneys and we may only consider the pro se litigant's claims "to the extent we believe we can do so without assuming a partisan role and undertaking [their] research and advocacy").

The jury trial took place on February 8.  The State presented evidence that Officer Dave Kelley interacted with Elphic at the local police station on October 19, 2017, in an unrelated matter.  As part of the interaction, Officer Kelley searched Elphic's pockets.  When the officer did so, he found two checks in the name of Palma Sierra.  The checks were blank other than the signature line, which contained "APS" signed on both.  A few weeks later, Palma Sierra went to the police department and gave officers notifications of insufficient checks she had received from the corporate headquarters of Kwik Star, Casey's, and Dollar General.  Using the notifications, Officer Kelley contacted the local stores at which the checks were presented to obtain any surveillance video that may exist involving the transactions.

The State introduced into evidence and played for the jury three videos of transactions from the dates and times Palma Sierra's checks were presented; two of the three store clerks who accepted the checks identified Elphic as the person in the video presenting the check in question.

After the testimony of the third store clerk, the court asked the prosecutor if he had another witness, and the prosecutor responded: "The States rests, Your Honor."  The court then indicated it was taking a recess, and the jury left the courtroom.  Elphic moved for a judgment of acquittal, arguing "the State did not present any evidence that Mr. Elphic did not have permission to use the checks of Ms. Ana Palma Sierra."  When the court gave the prosecutor a chance to respond, he stated: "Your Honor, um, I subpoenaed a witness who is not here yet, and um, that is Ms. Palma.  I could call the halls and see if she's here."  The following exchange then took place:

The Court: Why did you rest without doing that first?

Prosecutor: Your Honor, I did not intentionally—I meant to indicate to the court that I don't have a witness present so I said I wanted to rest.

The Court: So you didn't mean to say that?

Prosecutor: No, Your Honor.

The Court: Do you want to reopen your case at this point?

Prosecutor: Yes, Your Honor. It's a witness that is listed on my trial information. I'm sorry. What I wanted to indicate was that I wanted to take a short break.

Elphic resisted reopening the State's case, arguing allowing the State to present more evidence after stating it wished to rest would be prejudicial to Elphic. The court responded, "I do think it would be prejudicial, but if the State made a mistake. If you have a witness, we'll see if you have a witness to call." The State then noted they had "been on the record the entire time. It's been less than a couple minutes." Elphic made further record that he believed the court should rule on his motion for judgment of acquittal rather than allowing the State to present additional evidence. In response, the prosecutor stated:

Your Honor, it was through inadvertence and complete lack of presence of mind that I said we rested. I knew full-well that I had one more witness. She was subpoenaed. The interpreter was communicated with just this morning to be here at or around two o'clock. I caught my mistake within less than two minutes of making it, and I don't think it's prejudicial.

The court responded:

Again, I think what happened was just a mistake. [The prosecutor] subpoenaed this witness. He had to get a special court order to get an interpreter for the witness. In his opening he indicated that we would hear from this witness and that she would testify about this matter. I think he just misspoke. I think it was a mistake. I am going to allow the State to reopen.

The State then called Palma Sierra to the stand to testify. She testified she had closed the account the checks in question were written on in

approximately 2013. She was unsure what had happened with the remaining checks but believed she may have thrown them in the trash while cleaning years later. Palma Sierra testified she never signs checks with her initials, did not sign the checks in question, and did not authorize anyone to write checks from her account—including Elphic.

Elphic testified in his own defense. He testified he believed he had authorization to use the checks when he did so because a "friend that gave [him] the checks said 'here, you can use them but just make sure you pay me back.'" He intended to pay the friend back when he received his next check. Elphic was asked if the friend was pretending to be Ana Palma Sierra when she gave him the checks, and he responded, "Apparently. Her name was [Ana]. It wasn't who the court has here."

The jury found Elphic guilty as charged.

Before sentencing, Elphic filed a motion in arrest of judgment, reiterating his argument that his motion for judgment of acquittal should have been granted and the State should not have been allowed to reopen its case. The court denied the motion, ruling it believed the State's explanation of misspeaking when the prosecutor stated "[t]he State rests" rather than asking for a short break or recess. In support of its ruling, the court emphasized that it was clear from what came before the prosecutor's statement that he "meant to call that witness and that witness did appear and he had an interpreter." The court did not "think the scenario was that [the prosecutor] mistakenly thought that he had proven his entire case and decided to rest and was only then alerted to the mistake that he made by [Elphic's] motion for directed verdict." The court believed "it was always

[the prosecutor's] intention to call the victim in this matter." The court then sentenced Elphic to a term of incarceration not to exceed five years.

Elphic appeals.

## II. Discussion.

Elphic maintains the district court abused its discretion when it allowed the State to reopen the record to present evidence he did not have authorization or permission to use the checks in question after he moved for judgment of acquittal on those same grounds.[2] We review a district court's decision to allow the State to reopen the record for an abuse of discretion. *See State v. Teeters*, 487 N.W.2d 346, 349 (Iowa 1992).

Elphic maintains the district court may only reopen the record in a few enumerated circumstances: for the purpose of establishing venue, *see State v. Anderson*, 228 N.W. 353 (Iowa 1929); to further the testimony of a previously offered prosecuting witness, *see State v. Terry*, 203 N.W. 232 (Iowa 1925); to supplement or provide clarification to previously entered evidence, *see State v. Mason*, 203 N.W.2d 292 (Iowa 1972); to introduce the actual drugs that had been referred to throughout the State's presentation of evidence prior to resting, *see State v. Moreland*, 201 N.W.2d 713 (Iowa 1972); and to clarify an Iowa Code section related to the sentencing enhancement, *see State v. Long*, 814 N.W.2d 572 (Iowa 2012). He asserts the court may not allow the State to reopen its case to prove an element of the crime.

---

[2] Elphic also asserts the court allowing the record to be reopened violated his right to due process. He cites no authority to raise this issue to one of constitutional magnitude.

We agree our supreme court has found no abuse of discretion when a district court reopened the record in each of the enumerated instances, but it does not follow that the district court's authority to reopen the record is limited to only those instances. "A district court has broad discretion to reopen the record to allow the State to introduce further evidence." *Long*, 814 N.W.2d at 575; *see also State v. Mason*, 203 N.W.2d 292, 295 (Iowa 1972) ("We have allowed wide leeway in reviewing discretion of trial court in permitting a case to be reopened."). "A rule that unequivocally prohibited the district court from reopening the record after the State has rested is inconsistent with our rule that a court has discretion over such matters because a hard and fast rule would preclude the district court from exercising *any* discretion over such an issue." *Long*, 814 N.W.2d at 577.

That being said, "[a]llowing the State to reopen the record in a criminal case, after the defendant has moved for a judgment of acquittal, poses a particular concern." *Id.* Additionally, "reopening the record is more likely to be an abuse of discretion if the State is attempting to 'fill a gap in its proof of a prima facie case.'" *Id.* at 578 (citation omitted). The supreme court enumerated seven factors to consider in determining whether the court abused its discretion in allowing the State to reopen the case:

> (1) the reason for the failure to introduce the evidence; (2) the surprise or unfair prejudice inuring to the opponent that might be caused by introducing the evidence; (3) the diligence used by the proponent to secure the evidence in a timely fashion; (4) the admissibility and materiality of the evidence; (5) the stage of the trial when the motion is made; (6) the time and effort expended upon the trial; and (7) the inconvenience reopening the case would cause to the proceeding.

*Teeters*, 487 N.W.2d at 348.

Here, we question whether we need to consider the factors outlined above. The district court concluded the prosecutor misspoke when he stated he rested as he had no intention to close the State's case-in-chief at that time. *See, e.g., State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004) (recognizing that we give "considerable deference" to the trial court's credibility findings). This determination is supported by the facts that the prosecutor mentioned Palma Sierra by name during opening arguments and had applied for and received prior court approval for an interpreter for her testimony at trial. Additionally, it appears both the interpreter and witness showed up for trial at the previously scheduled time—after the prosecutor said he rested—without the prosecutor having to take further steps to secure either person's presence. Concluding the prosecutor's slip of the tongue was enough to rest the State's case would seem to engage in "excessive procedural rigidity," which "risks reducing the trial to 'a game of technicalities.'" *Long*, 814 N.W.2d at 577 (citation omitted).

If we were to consider the factors, we would find they weigh in favor of allowing the State to reopen its case. First, based on the determination the State always intended to call Palma Sierra, we cannot say the State failed to introduce the evidence Elphic did not have authority or permission to use the checks, the State just had not introduced the evidence yet. Additionally, there is no surprise or unfair prejudice, as the State listed Palma Sierra in the minutes of evidence and mentioned her by name during opening arguments as a person who would testify. While Palma Sierra's testimony prejudiced Elphic, as the district court stated, the prejudice was not unfair since Elphic had been given notice of the testimony and does not claim its admission into evidence changed his trial

strategy or decision to testify. The State secured the evidence of Palma Sierra's testimony by subpoenaing her and was prepared to offer her testimony with the aid of an appointed interpreter. The evidence her testimony provided was both admissible and material to the case, and there was little to no inconvenience in reopening the case as it occurred—according to the prosecutor's uncontested statement on the record—about two minutes after he first stated he rested.

The district court did not abuse its discretion in allowing the State to call Palma Sierra to testify. Because her testimony was properly part of the record, substantial evidence supports the jury's verdict convicting Elphic of forgery.

**AFFIRMED.**